## THE MAINE.

## THE MANHATTAN.

### (District Court, S. D. New York. March 17, 1908.)

1. SHIPPING—CONTRACT AS PRIVATE CARRIER—VALIDITY OF PROVISIONS—EXEMPTION FROM LIABILITY.

Under a contract between a lighterage company and a manufacturer, by which the company agreed to transport property of the latter in New York Harbor and vicinity, and for such purposes furnished it the full capacity of lighters or barges when such transportation was required, as between the parties the company was a private and not a public carrier, and a provision of the contract, by which in consideration of the making of a lower rate the shipper agreed to exempt the carrier from liability for loss or injury to cargoes from negligence, was not within section 1 of the

Harter Act (Act Feb. 13, 1893, c. 105, 27 Stat. 445 [U. S. Comp. St. 1901, p. 2946]), but is valid and enforceable.

[Ed. Note.—Statutory exemptions of shipowners from liability, see notes to Nord Deutscher Lloyd v. Insurance Co. of North America, 49 C. C. A. 11; Ralli v. New York & T. S. S. Co., 83 C. C. A. 294.]

2. Collision—Damages Recoverable—Release of One of Two Vessels in Fault.

The steamers Maine and Manhattan were both held in fault for a collision between the Maine and the barge Collard in tow of the Manhattan by which a portion of the Collard's cargo was lost. The entire cargo was owned by libelant, and was being transported by the claimant under a contract with it as a private carrier, which provided that libelant should have no claim upon the claimant or its equipment or boats which it might charter or control for any loss of cargo. The Collard was owned by the claimant, and the Manhattan was demised to it by charter. *Held* that, it being a private carrier, the agreement for exemption from liability was valid, and the Manhattan being chartered by it as a towing vessel was within its terms and exempted; that libelant having contracted for such exemption was not entitled to recover more than half damages against the Maine, the joint tort-feasor rule not being applicable.

In Admiralty.  On exceptions to commissioners' report.

Kneeland & Harrison, for libellant.
Wing, Putnam & Burlingham, for the Maine.
Carpenter, Park & Symmers, for the Manhattan.

ADAMS, District Judge. This was an action arising out of a collision between the barge Abram Collard, in tow of the steamer Manhattan, and the steamer Maine, which struck the Collard and caused her to lose her deck load of pigs of lead and boxes of vitriol. The damages were divided between the Maine and the Manhattan, and a reference ordered to ascertain the damages (153 Fed. 635).

In the answer of the Manhattan a further defence was pleaded:

"VIII. That at the time of the collision herein alleges, and the loss consequent thereupon, there was a written contract existing between the Commercial Lighterage Company and the libellant, the original of which the claimant will produce upon the trial of this action, the terms of which, Article Sixth, are as follows:—

'The Lighterage Company is to be held responsible for the full actual value of all material short-delivered at Perth Amboy or in New York Harbor, unless such short-delivery is caused by fire, or perils of the sea. It is understood, however, that the Lighterage Company is responsible for all receipts given and taken by their barge captains in the dealings with steamship lines, consignees, or the shipping plant. Insurance will be effected by the Smelting Company at their expense and no underwriter claiming through the Smelting Company is to have any claim upon the Lighterage Company, or upon their equipments or boats that they may charter or control, in case of loss. Should the Smelting Company fail to effect the necessary insurance, no claim for such loss will be made upon the Lighterage Company owing to such failure, neither will the Lighterage Company be held liable for any such loss no matter how occurring because of the failure of the Smelting Company to insure.'"

The correctness of these allegations was admitted by the libellant.

This defence, as well as the ascertainment of the amount of damages, was duly referred to a commissioner, who has reported:

"The interlocutory decree in the above cause referred it to me, the undersigned, to ascertain and report the amount of libellant's damages, with instructions to take and receive such proof as might be offered in respect to the

separate and distinct defense alleged in article VIII of the answer of the claimant of the Manhattan, and report the same with my opinion thereon.

I report that I was attended by the proctors for the respective parties, who offered testimony and exhibits which are filed herewith; and I further report as follows:

1. The cargo of the barge Collard, at the time of the collision, consisted of lead in pigs and copper sulphate or vitriol, which had been shipped by libellant to fill contracts of sale. The greater portion of the cargo was recovered by the Merritt & Chapman Derrick & Wrecking Company, under a contract made by that company with underwriters on the cargo, who paid for the services at the contract rate. In addition there were various incidental expenses connected with saving cargo. No question has been raised as to the reasonableness of the charges.

I find that the damages, exclusive of interest, were $10,305.29, made up as follows:

| | |
|---|---:|
| 141 Boxes Vitriol 20,135 lbs. at 4½¢ | $ 906.08 |
| *Domestic Lead.* | |
| 960 Pigs 100.091 lbs. at 5.10 | 5,104.64 |
| 949 " 100.031 " at 4.85 | 4,851.50 |
| *Export Lead.* | |
| 1838 Pigs, 190.452 lbs. (at 3.0875) £1208. 6. 1. at 4.8665 | 5,880.21 |
| 1058 Pigs, 112.035 lbs. (at 3.1472) M. 14,104.30 at 25¢ | 3,526.08 |
| **Value of shipment** | **$20,268.51** |

Recovered.

| | |
|---|---:|
| *Domestic Lead.* | |
| 836 Pigs, 87130 lbs. at 5.10 | 4,443.63 |
| 947 " 99820 " at 4.85 | 4,841.27 |
| *Export Lead.* | |
| 1775 Pigs, 183.888 lbs. at 3.0875 | 5,677.54 |
| 1012 " 107.142 " at 3.1472 | 3,371.97 |
| 4570 477,900 lbs. | $18,334.41 |
| Less freight at 50¢ per ton, | 119.50 |
| | $18,214.91 |
| Value shipped | $20,268.51 |
| " recovered | 18,214.91 |
| | $ 2,053.60 |
| Paid Merritt & Chapman Co. for wrecking services | 8,045.89 |
| Paid Commercial Lighterage Co. | 125.77 |
| Paid expenses rehandling | 70.03 |
| Paid Custom House, | 10.00 |
| | $10,305.29 |

2. The cargo was covered by three policies insuring libellant against loss, including loss by negligence, one policy being issued by the Federal Insurance Company, and two by the Marine Insurance Company, limited, of London, all dated April 29, 1905. Each policy also contained the following:

'And Warranted by the assured free from any liability for merchandise in the possession of any carrier or other bailee, who may be liable for any loss or damage thereto; and for merchandise shipped under a Bill of Lading containing a stipulation that the carrier may have the benefit of any insurance thereon; and that any insurance granted herein, shall not cover where any carrier or other bailee has insurance (whether prior or subsequent in date to this policy) which would attach if this policy had not been issued.'

After the completion of the salvage operations, libellant made claims under these policies, received from the underwriters $2,134.38, the amount of its loss, January 29, 1906, and signed and delivered to the underwriters two receipts, one for $1,234.38 and the other for $900, in each of which the amount was described as a loan 'repayable only to the extent of any net recovery we may make from any carrier, bailee or others on account of loss to our property (described below) due to Bge Abram Collard colliding with Str Maine in East River on or about Sept. 1st, 1905, or from any insurance effected by any carrier, bailee or others on said property, and as security for such re-payment we hereby pledge to the said Marine Insurance Company, L'td., the said recovery and deliver to them duly endorsed the Bills of Lading for said property and we agree to enter and prosecute suit against said Railroad, carrier, bailee, or others on said claim with all due diligence at the expense and under the exclusive direction and control of the said Marine Insurance Company, Limited.' The underwriters also paid the above mentioned bill of the Commercial Lighterage Company. When the policies were issued, and when the contract was made with the wrecking Company, the underwriters knew nothing of a transportation contract between the Commercial Lighterage Company and libellant which contained the provision set forth in the 8th article of the answer of the Manhattan, and which was made on or about March 11, 1904, was in force at the time the cargo was shipped and lost, and under which the cargo was carried. The Manhattan was owned by Moses W. Collyer, general manager of the lighterage company, and he is the claimant of the Manhattan. At the time of the collision and loss, the Manhattan was under charter to, and under the control of, the lighterage company, in towing barges in New York harbor on which were laden goods of libellant. The barge Collard, on which the cargo was laden, was owned by the lighterage company, libellant had her full capacity, its goods alone were being carried, and the prices stipulated in the transportation contract were less because of that clause. The lighterage company was a West Virginia corporation, engaged in the lighterage and general transportation business in New York Harbor, on the Hudson River, and on Long Island Sound. Its contract with libellant was set forth in a letter from libellant, on which the acceptance of the lighterage company was noted at the foot. It in terms covered 'the handling of lighterage business of the American Smelting & Refining Company between points within the lighterage limits of New York Harbor and Perth Amboy,' specified rates and various details in connection with the services to be rendered, and besides the clause referred to, contained the following:

'Seventh: On all business moving from Perth Amboy to points in New York Harbor lighterage limits, the Lighterage Company's boats shall receive full loads, provided the tonnage is ready for shipment and the required deliveries can be satisfactorily made to the connecting steamship lines.'

'Ninth: All rates mentioned shall include the hiring of all barges, necessary tools and equipment, and towing, also the shifting to and between different deliveries, and the rates shall cover deliveries at docks. The Lighterage Company also attend the loading and unloading and handling, except at Perth Amboy, at which latter place the labor of loading and unloading shall be taken care of by the Smelting Company, it being understood, however, that the bargemen shall tend guys at Perth Amboy when necessary. This clause is not to conflict with provisions of clause No. 4 regarding slag, except that bargemen are to tend guys at Perth Amboy when handling slag.'

'Fourteenth: The boats used by the lighterage company are to be good, sound and seaworthy, and are to be acceptable to the insurance company.'

The action was brought and has been prosecuted for the benefit of the underwriters, who are alone entitled to the recovery, and at whose expense the suit is maintained under the above receipts. Libellant's counsel dwells upon the fact that the lighterage company is not a party, but the libel is against the Manhattan, which the lighterage company did not own. But the lighterage company would be bound to respond to the owner of the Manhattan for any damages for which the vessel might be condemned, and therefore is the real party in interest, although not a party of record. Assuming that the contract would be a good defense if the suit were against the lighterage company, then if the owner and claimant of the vessel were required to pay in

this suit, he could compel the lighterage company to make good the amount and that company, it seems to me, could in turn compel libellant to reimburse it. To avoid this circuity of action, the claimant of the vessel should be permitted to plead the contract to the same extent as the lighterage company. The mere fact that the vessel was chartered by the lighterage company, instead of being legally owned by it, should make no difference when the lighterage company was owner pro hac vice. If the claimant had brought the lighterage company into the cause by petition, as he might have done, the court would have been compelled to exonerate the company; and under such circumstances, it surely would not have condemned the vessel, as between whose owner and the company the liability, if any, rested upon the latter. Therefore the case is to be considered in all respects as if the lighterage company were sued and had interposed the defense.

It is conceded by libellant, that if the goods had been aboard the Manhattan, the Harter Act would have been a defense as against that vessel, because the loss arose through errors of navigation, and it is conceded by the claimant that if the lighterage company were a common carrier as to libellant in the transportation of the goods, the contract would not furnish a defense, because void as against public policy so far as it sought to relieve the carrier from liability for negligence; but it is maintained that the lighterage company was not a common carrier, but a private carrier for hire, and The Fri, 154 Fed. 333, 83 C. C. A. 205, is cited. In that case it was said, referring to stipulations whereby vessel and owners are exempted from liability for loss due to negligent navigation:

'When a charter party gives to the charterer the full capacity of the ship, the owner is not a common carrier, but a bailee to transport as a private carrier for hire. Hutchinson, Carriers (2d Ed.) 73. See, also, Sumner v. Caswell (D. C.) 20 Fed. 249, and the authorities there referred to. It has not yet been decided by any court that a condition in such a contract, to which the Harter Act has no application, relieving a shipowner from liability on account of the carelessness of its employés, is contrary to public policy.

The decisions which deny the validity of such stipulations proceed upon the ground that the carrier is exercising a public employment, and cannot by such stipulations relax his obligations to the public. Private carriers are not subject to the exceptional or extraordinary duties and liabilities of common carriers, and they may carry for whom they choose, and for such compensation and upon such conditions of liability as may be agreed upon. The contracting parties stand upon equal terms, and can make such a contract as they think reasonable. Angell, Law of Carriers, 59.'

Under this decision and the testimony above referred to as to the relations between the lighterage company and libellant, it is clear that the lighterage company was a private carrier, and that the contract was valid. The contract was manifestly intended to prevent any such claim as is now made, since it provides that 'no underwriter claiming through the Smelting Company is to have any claim upon the Lighterage Company, or upon their equipments or boats that they may charter or control. in case of loss.' No contracts or transactions between libellant and its underwriters, to which the lighterage company was not a party, could defeat or impair the lighterage company's rights under this contract with libellant. I find, therefore, that the defense referred to in the order of reference should be sustained.

3. The remaining question is whether the Maine should be held liable for the whole damages. Had there been no such transportation contract between libellant and the lighterage company, and had the Maine alone been libelled, although the decree would have been for full damages, the owner of the Maine would have had the right to enforce contribution against the lighterage company in a suit in admiralty (Eric R. R. Co. v. Erie Transportation Company, 204 U. S. 220, 27 Sup. Ct. 246, 51 L. Ed. 450); and in the absence of the contract, the decree to be entered in this action would, under settled practice, provide that each vessel bear one-half of the damages, and that if libellant should be unable to collect from either vessel, the other should bear the whole amount. But this inability to collect refers to an inability not produced by the libellant. If libellant should execute a release to one party, or with its eyes open take any other step that would discharge one of the par-

ties, it would not be permitted to exact the whole amount from the other. I do not see that the situation is changed by the mere fact that libellant took such steps before the collision occurred. In The George W. Roby (D. C.) 103 Fed. 328, it was said to be clear that 'in a suit for collision the rule of mutual liability when both vessels are in fault cannot be defeated by the contract of affreightment of their respective cargoes.' As libellant has by its voluntary act prevented the Maine from obtaining contribution, I do not consider that libellant should be allowed to recover more than half its damages against the Maine. Libellant could not, by contract with the lighterage company, extinguish the legal rights of a third party, and should be deemed to have contemplated the present situation as a consequence of its contract.

### Conclusions.

I therefore find:

1. That the libel should be dismissed as against the Manhattan.

2. That libellant is entitled to a decree against the Maine for one half of the total damages as hereinbefore set forth, as follows:

| | |
|---|---|
| ½ the value of lost cargo | $1,026.80 |
| ½ Merritt & Chapman's bill | 4,022.89 |
| ½ Commercial Lighterage Company's bill | 62.88 |
| ½ Expenses of rehandling | 35.02 |
| ½ Custom House expenses | 5.00 |
| | $5,152.59. |

Libellant is also entitled to interest on the above $1,026.80 from September 1, 1905, the date of the collision, on $3,500 of Merritt & Chapman's bill from November 16, 1905, when $7,000 of the whole bill was paid, on $522.95 of the same bill from January 29, 1906, when the balance of the whole bill was paid, on the above $62.88 from January 11, 1906, when the whole bill of the lighterage company was paid, and on the above items of $35 and $5 from January 29, 1906."

## The libellant excepted to the report, as follows:

"First Exception: In that the Commissioner found that the Commercial Lighterage Company, the owner of the Barge 'A. J. Collard,' upon which libellant's cargo was laden, was not a common carrier, but a private carrier for hire.

The ground for this exception is that the evidence does not justify this finding.

The following is all the evidence introduced here upon this point.

Clarence Thorn Snyder, called as a witness for the Manhattan, being duly sworn, testified as follows:

Direct Examination by Mr. Park:

Q. What is your business? A. Lighterage business.

Q. For whom and by whom? A. Now vice-president of the Inter State Lighterage Company.

Q. Do you remember the collision of the steam lighter Manhattan? A. I do.

Q. What was your business at that time? A. Sort of an agent of the Commercial Lighterage Company.

Q. Do you know the barge Collard? A. Yes, sir.

Q. Do you remember the goods she carried? A. I do. Lead and copper.

Q. Shipped by whom? A. The American Smelting & Refining Company.

Q. Did the American Smelting & Refining Co. have the full capacity of the barge Collard? A. Yes, sir.

Moses W. Collyer, called as a witness for the Manhattan, being duly sworn, testified as follows:

Direct Examination by Mr. Park.

Q. What was your occupation in 1906? A. I was general manager of the Commercial Lighterage Company.

Q. Do you know the Collard? A. Very well.

Q. Who owned her in 1906? A. The Commercial Lighterage Company.

Q. And the Commercial Lighterage Company is under a contract with the American Smelting & Refining Company relative to goods to be carried on the barge Collard? A. Yes, sir.

Q. Did you make that contract? A. Yes, sir.

Q. I want to ask that if the price stated in your contract was greater or less on account of the American Smelting & Refining Company assuming the risk of transportation? A. It was less.

Q. Do you remember the collision between the barge Collard and the Manhattan and Maine in 1906? A. Yes, sir.

Q. Do you know what goods she had loaded on her at the time? A. Yes, sir.

Q. Is this the contract which I now hand you between the American Smelting & Refining Co. and the Commercial Lighterage Company (hands paper to witness)? A. That is the original contract.

Same offered in evidence and marked Manhattan's exhibit A.

Cross Examination by Mr. Kneeland:

Q. Was the Commercial Lighterage Company a corporation? A. Yes, sir.

Q. Organized where? A. In the State of West Virginia.

Q. Have you a copy of the Certificate or Articles of Incorporation? A. No, sir.

Q. Have you a charter? A. I didn't organize it and I would have to find that out from one of the officers, may be the president. Soon after this accident happened the company went into dissolution and there were some papers sent back to West Virginia. Whether this particular paper was sent back or not I don't know.

Q. Who is the president? A. Mr. Gear.

Q. What business was the Commercial Lighterage Company in? A. In the lighterage business.

Q. It took contracts from different firms like the American Smelting & Refining Company? A. Yes, sir.

Q. For the general transportation of merchandise on lighters from different points through the harbor of New York? A. Yes, sir.

Q. Did you advertise? A. No, sir.

Q. No advertisement at all? A. No, sir.

Q. Are you sure of that? A. We didn't advertise in any newspapers.

Q. Did you advertise in any of the shipping papers? A. We went around and got contracts from different people like the American Smelting & Refining Company and others.

Q. Will you look at the papers which I show you (hands paper to witness), is that a letter written by your company? A. I think so.

Q. That is the usual letter head which your company used? A. Yes, sir.

I ask to have it marked in evidence.

Same marked libellant's exhibit 9 of this date.

Q. Is that one of the bill heads which the company used (shows witness paper)? A. Yes, sir.

Q. Those were in general use in your business? A. Yes, sir.

Same offered in evidence and marked Libellant's exhibit 10 of this date.

Objected to by Mr. Park as being immaterial. Objection overruled.

Q. Did the Commercial Lighterage Company own a number of vessels? A. Yes, sir.

Q. Such as lighters, barges and steamtugs? A. Yes, sir.

Q. You had no particular contract with the American Smelting & Refining Company in regard to the barge Collard? A. No more than to any other barge that we had.

Q. In other words, you had a contract to carry their goods, and in the performance of that contract you sent whatever boats you had available, is that right? A. Yes, sir. They had the exclusive use of that boat.

Q. Do you mean that when you sent a boat to carry their goods that that particular boat carried only their goods? A. Yes, sir.

Q. And you sent just as many boats as were necessary to carry the goods that they offered you? A. Yes, sir.

Charles Johnson, called as a witness for the Manhattan, being duly sworn, testified as follows:

Direct Examination by Mr. Park:

Q. By whom are you employed at the present time? A. Southern Pacific Company.

Q. By whom were you employed in 1906? A. By the Southern Pacific Company.

Q. Were you on the Collard at the time of the collision with the steam lighter Manhattan in the East River in 1906? A. Yes, sir.

Q. What was your position at that time? A. Captain.

Q. Was she loaded? A. Yes, sir.

Q. Where did you get the goods? A. From the American Smelting Company.

Q. Was she fully loaded? A. Not quite fully loaded.

Q. Did you receipt for the goods put on board? A. Yes, sir.

Q. Any other goods excepting the American Smelting & Refining Company's on board or not? A. No others.

Q. When did you first go to work for the Southern Pacific; how many months ago? A. 25 months ago.

Q. Two years ago? A. Yes, sir.

Q. How long after the collision between the Collard and the Manhattan did you go to work for the Southern Pacific? A. Three months afterwards.

(Manhattan's exhibit A. and libellant's exhibits 9 & 10).

Second Exception: In that the Commissioner found that the agreement set out in the Eighth article of the answer of the claimant of the 'Manhattan' and forming part of the contract dated March 11, 1904, between the libellant and the Commercial Lighterage Company (Manhattan Exhibit A.) and reading as follows,—"

(Here follows the special agreement pleaded.) "was a valid contract.

The ground for this exception is that in so far as such contract purports to require the libellant to insure its cargo for the benefit of the Commercial Lighterage Company or to exempt the Lighterage Company from liability for losses caused by the negligence of its employees or agents, it is void.

Third Exception: In that the Commissioner found that the agreement set out in Article Eighth of the answer of the claimant of the 'Manhattan' constituted a defense to the libellant's claim against the 'Manhattan.'

The grounds for this exception are,—

(1) That if such agreement is valid, it relates and applies only to claims against the boats on which the libellant's cargo should be loaded and carried, and against the Commercial Lighterage Company as owner or charterer of such boats, and does not relate or apply to claims against steamers employed or chartered by the Lighterage Company to tow such carrying boats.

(2) That the contract does not relieve the Commercial Lighterage Company or its boats from liability for losses due to negligence of its servants or agents.

Fourth Exception: In that the Commissioner found that the libel should be dismissed as against the 'Manhattan.'

Fifth Exception: In that the Commissioner found that the libellant by its contract with the Commercial Lighterage Company, has prevented the 'Maine' from recovering contribution from the 'Manhattan.'

Sixth Exception: In that the Commissioner found that the libellant was entitled to recover only one half of its damages against the 'Maine.'

Seventh Exception: In that the Commissioner did not find and report that the libellant is entitled to recover the whole amount of its damages ($10,305.29) with interest, against the 'Maine,' and that the claimant of the 'Maine' was entitled to recover half of such damages from the 'Manhattan.'

Eighth Exception: In that the Commissioner did not find that the libellant is entitled to recover its whole damages amounting to $10,305.29, with interest and costs,—one half to be paid by the 'Maine' and one half by the 'Manhattan,' and that any balance of either of said halves not collectible against either of said vessels, be paid by the other."

No other exceptions have been taken to the report.

Upon the proceedings before the commissioner, the contract (in the form of an accepted letter from the libellant) between the Commercial

Lighterage Company and the libellant was admitted in evidence and contained the clause quoted above.

The first point made by the exceptant is that the evidence establishes that the Commercial Lighterage Company was a common carrier. The evidence relied upon is fully set forth in the exceptions and it appears thereby that the Collard was owned by the Lighterage Company which was under a contract (mentioned above) relative to goods to be carried by the boats owned or employed by that company, of which the Collard was one. It was shown that the price for transportation was less on account of the Smelting Company assuming the risks incident to transportation; that the company was in the lighterage business and took contracts from different firms like the Smelting Company for the general transportation of merchandise on lighters from different points through the Harbor of New York; that the company did not advertise in the newspapers but went around and obtained contracts from different people like the Smelting Company and others; that the usual letter head of the company contained the following: "General Transportation: New York Harbor, Hudson River and Long Island Sound"; that the bill heads of the company, which were in general use by it, contained the same; that the company owned a number of vessels, such as lighters, barges and steamtugs; that there was no contract in regard to the Collard, no more than any other barge that it had; that it had a contract to carry the Smelting Company's goods and in the performance thereof, it sent whatever boats that were available; that the Smelting Company had the exclusive use of the boat sent.

The argument advanced is that the company was a common carrier because:

" * * * it was a corporation engaged in the lighterage business, holding itself out as doing the business of General Transportation in the waters in this vicinity, seeking and carrying on the business of transportation for hire of the goods of such persons as chose to employ it; and that in the absence of any special contract it would be held liable for all losses for which common carriers are not exempted at common law or by statute."

While the Lighterage Company held itself out to the public as a carrier for hire, it did not offer to carry for all who might apply and was not under an obligation to take the goods of the public generally without discrimination at reasonable and common rates. On the contrary, it is evident that it reserved the right to carry for whom it pleased at such rates as should be agreed upon. The law upon the matter is discussed and the differences between common and private carriers pointed out in the recent work of Moore on Carriers, pp. 10 to 23, inc. The principle was adopted by the Circuit Court of Appeals in this district in the case of The Fri, 154 Fed. 333, 83 C. C. A. 205, cited, and extracts quoted therefrom by the commissioner. The libellant cites some language from Railroad Company v. Lockwood, 17 Wall. 357, 376, 21 L. Ed. 627, which it deems favorable to its contention. But, even if so, it can have no effect here because the point in question was not under consideration by the court. Mr. Justice Bradley, in writing the opinion, said (page 359 of 17 Wall. [21 L. Ed. 627]):

"The question is, therefore, distinctly raised, whether a railroad company carrying passengers for hire, can lawfully stipulate not to be answerable for their own or their servants' negligence in reference to such carriage."

It was decided in that leading case, that a common carrier cannot lawfully stipulate for exemption from responsibility for negligence. That a private carrier may do so is held in The Fri, supra.

The determination above also determines the libellant's second exception adversely to it.

The next exception is to the effect that even if the Lighterage Company was a private carrier and the agreement therein contained a provision against liability, such agreement does not constitute a defence to the libellant's claim against the Manhattan, because (a) the contract does not cover or relate to anything but the boats carrying the libellant's goods, and has no application to the liability of another boat engaged in towing the carrying vessels, even though chartered and controlled by the Lighterage Company, and (b) the contract does not in terms cover losses resulting from negligence, more particularly does not cover losses from the negligence of a towing boat.

The contract, containing the provision quoted above, seems to be a reply to the contention. There is nothing specifically mentioned about negligence, but when it is said that no underwriter, claiming through the Smelting Company, is to have any claim upon the Lighterage Company, or upon their equipment or such boats as it may "charter or control," it seems to be sufficient to prevent the underwriter here, though using the name of the Smelting Company, from enforcing the claim in question against the Manhattan, which was "towing" one of the Lighterage Company's boats, and in that sense may be considered as a part of the equipment or boats chartered and controlled by the company. The ninth paragraph of the contract provided:

"All rates mentioned shall include the hiring of all barges, necessary tools and equipment, and towing, * * *"

The fourth exception, with succeeding ones, claims that even if the agreement is valid and constitutes a defence to any suit by the libellant against the Manhattan, the libellant is nevertheless entitled to recover the whole of its damages from the Maine and that vessel is entitled to recover contribution thereto from the Manhattan.

The libellant contends that the admiralty moiety rule has no effect upon the rights of innocent cargo owners, citing The Alabama and The Game-Cock, 92 U. S. 695, 697, 23 L. Ed. 763, and The Atlas, 93 U. S. 302, 317, 23 L. Ed. 863. In the former, it was said:

"In short, the moiety rule has been adopted for a better distribution of justice between mutual wrong-doers; and it ought not to be extended so far as to inflict positive loss on innocent parties."

And in The Atlas, it was said:

"Contributory negligence on the part of the libellant cannot defeat a recovery in collision cases, if it appears that the other party might have prevented the disaster, and that he also did not practice due diligence, and was guilty of negligence, and failed to exercise proper skill and care in the management of his vessel. Proof of the kind will defeat a recovery at common law; but the rule in the admiralty is, that the loss in such a case must be apportioned between the offending vessels, as having been occasioned by the fault

of both; but the rule of the common law and of the admiralty is the same where the suit is promoted by an innocent party, except that the moiety rule may be applied in the admiralty, if all the parties are before the court, and each of the wrong-doers is able to respond for his share of the damage. Subject to that qualification, the remedy of the innocent party is substantially the same in the admiralty as in an action at law, the rule being, that in both he is entitled to an entire compensation from the wrongdoer for the injury suffered by the collision."

In The Chattahoochee, 173 U. S. 540, 19 Sup. Ct. 491, 43 L. Ed. 801, it was held that notwithstanding the exemptions given by the Harter Act, an innocent cargo-owner is entitled to recover his entire damages from the carrying and non-carrying vessel, and that the latter's right, set-off or recovery of contribution from the carrying vessel is not affected.

These, and other authorities, only leave the question here, was the libellant, in effect, a wrong-doer in the sense applied in those cases? It was not a wrong-doer but it had stipulated away its rights so far as the Manhattan was concerned, and cannot be deemed an innocent party.

The libellant cites and relies upon the greatly litigated cases arising out of the New York-Conemaugh collision in 1891, viz: The New York, 175 U. S. 187, 20 Sup. Ct. 67, 44 L. Ed. 126; Ex parte Union Steamboat Company, 178 U. S. 317, 20 Sup. Ct. 904, 44 L. Ed. 1084; The Conemaugh, 189 U. S. 363, 23 Sup. Ct. 504, 47 L. Ed. 854; Erie R. R. Co. v. Erie Transportation Co., 204 U. S. 220, 27 Sup. Ct. 246, 51 L. Ed. 450. In the beginning of the opinion in the last named case, Mr. Justice Holmes described the litigation as follows:

"This is a libel in admiralty brought by the petitioner as successor in corporate identity to the Union Steamboat Company, to recover a part of a sum paid by it to the respondent as the result of previous admiralty proceedings which came before this court several times. The former proceedings were begun by the respondent, as owner of the propeller Conemaugh and bailee of her cargo, to recover for damages to both by a collision between her and the propeller New York. After hearings below (The Conemaugh [D. C.] 53 Fed. 553; The New York, 82 Fed. 819, 27 C. C. A. 154; Id., 86 Fed. 814, 30 C. C. A. 628), it was decided by this court, on certiorari, that both vessels were in fault, and that the representatives of the cargo could recover their whole damages from the New York. The New York, 175 U. S. 187, 20 Sup. Ct. 67, 44 L. Ed. 126. Thereupon the District Court entered a decree dividing the damages sustained by the steamers, requiring the New York to pay to the Conemaugh on that account $13,083.33 and interest, and further required it to pay all the damages to the cargo of the latter—the insurers on cargo who had intervened receiving their share, and the Conemaugh receiving the residue as trustee. The owners of the New York then applied to this court for a mandamus directing the District Court to divide the damages to cargo. This was denied on the ground that if the court below erred the remedy was by appeal. Ex parte Union Steamboat Company, 178 U. S. 317, 20 Sup. Ct. 904, 44 L. Ed. 1084. Upon that intimation an appeal was taken to the Circuit Court of Appeals for the Sixth Circuit and after a motion to dismiss had been denied (The New York, 104 Fed. 561, 44 C. C. A. 38), the decree was affirmed, 108 Fed. 102, 47 C. C. A. 232. On a second certiorari that decree was affirmed by this court. The Conemaugh, 189 U. S. 363, 23 Sup. Ct. 504, 47 L. Ed. 857. The New York paid the damages and brought this suit."

A careful examination of these authorities fails to reveal any decision or intimation that a doctrine exists in admiralty which would prevent a full application of the equitable rule that a wrong-doer must,

if possible, bear the loss for which he is responsible but not that of another party. Admiralty has always sought to impose the liability for damages where it belonged. Of course at. common law, any one of several joint tort-feasors can be held for all of the damages to which he was a party and this has been applied in admiralty where only one was sued. It was said by Mr. Justice Brown, in The New York, 175 U. S. 209, 210, 20 Sup. Ct. 67, 75, 44 L. Ed. 126:

"4. The final question arises upon the insistance of the underwriters of the Conemaugh's cargo, that they are entitled to a recovery to the full amount of their damages against the New York, notwithstanding the Conemaugh may also be in fault for the collision. They are correct in this contention. Indeed, this court has already so decided in the case of The Atlas, 93 U. S. 302, 315, 317, 23 L. Ed. 863. This was a libel against the Atlas by an insurer of the cargo of a canal boat in tow of the steamtug Kate, whereby the canal boat and her cargo were lost. It was insisted by the claimant that, as the libellant had failed to make the Kate a party, and as both vessels were found to be in fault for the collision, there could be a recovery of only a moiety of the damages. The case of The Milan, Lush. 388, was confidently relied upon as an authority. This court, however, was of opinion that a plaintiff, who has suffered a loss by the negligence of two parties, was at liberty, both at common law and in admiralty, to sue both wrong-doers or either one of them at his election, and 'it is equally clear', that, if he did not contribute to the disaster, he is entitled to judgment in either case for the full amount of his loss. He may proceed against all the wrongdoers jointly, or he may sue them all or any one of them separately. * * * Co-wrongdoers, not parties to the suit, cannot be decreed to pay any portion of the damage adjudged to the libellant, nor is it a question in this case whether the party served may have process to compel the other wrongdoers to appear and respond to the alleged wrongful act.' A like ruling was made in The Juniata, 93 U. S. 337, 23 L. Ed. 930, in which a libel was filed by the United States as owner of the cargo of a flatboat in tow of one of two vessels."

That language does not apply here. If the Maine had alone. been proceeded against, a full recovery could properly have been adjudged against her. In the beginning, she would have had the right under Rule 59, to bring in the Manhattan and require her in the end to contribute to the recovery. Such a course was not necessary here because both vessels were proceeded against and in holding both in fault, each was liable for her respective share. The libellant, as it appeared when the Manhattan's relations to the libellant were pressed, was not entitled to recover against her because it had disqualified itself, by a lawful stipulation from doing so. It was thus not the case of a joint tort-feasor, in the full sense of the word, but of a proceeding against two vessels, each of which contributed to the collision, but in which one of the vessels was exempted from liability by stipulation. This should not affect the other vessel, either to increase or diminish her responsibility, and the commissioner's determination is, therefore, correct.

All of the exceptions are overruled and the report confirmed.