BROWN *v.* AMERICAN FINANCE Co. and others.

(*Circuit Court, S. D. New York.* May 11, 1887.)

1. CONTRACT—LEX·LOCI.
   The law of the place where the contract is made, not that of the place of performance of the contract, is the law which determines whether the contract is void for illegality.

2. SAME—CONFLICT OF LAWS.
   If the contract is sanctioned by the law of the state in which it is made, and is not immoral, the courts of another state will treat it as lawful, although the laws of that state prohibit such a contract.

3. SAME—USURIOUS CONTRACT—PLACE OF MAKING.
   A contract was made in the state of Rhode Island, and promissory notes were given thereunder and negotiated in the same state. The notes purported to be made at New York, were payable there, and New York was the place for substantial performance of the contract. The maker of the notes subsequently alleged usury in the transaction, and filed a bill on this ground for a surrender and cancellation of the contract and notes. *Held,* that the same being valid and free from usury in Rhode Island, where they were made, the complainant was not entitled to the relief prayed for.

In Equity.

*Burton N. Harrison,* for complainant.

*Robert Ludlow Fowler,* for defendants.

WALLACE, J. The relief sought by the bill is, among other things, (1) the cancellation of a contract of the date of April 14, 1884, entered into between the complainant and the defendant the American Finance Company, or that the agreement be reformed; (2) that an agreement of the date of September 24, 1884, between the complainant, party of the first part, the defendant the American Finance Company, party of the second part, and the defendants Mason and Jillson, parties of the third part, be adjudged to be usurious and void, and surrendered up for cancellation; (3) that certain notes, executed by the complainant pursuant

to the agreement last mentioned, be adjudged usurious and void, and surrendered for cancellation; (4) that the defendants be restrained from selling or negotiating certain railway mortgage bonds received as a pledge to secure the payment of the notes, and be decreed to deliver the same to the complainant.

A motion has been made to restrain the defendants *pendente lite* from doing any of the acts which are sought to be permanently enjoined by the prayer of the bill. Since the motion was heard, an adjustment has been made between the parties, except as between the complainant and the defendant the American Finance Company, with the result, as stated in the brief of counsel, to narrow the original matters of the bill to a controversy between complainant and the finance company, in respect to one note for $10,000, and 102 bonds for $1,000 each. The defendant derives title to the note and to 22 of the bonds in question from Mason and Jillson, who acquired the same from the complainant to secure the payment of the loan contemplated by the agreement of September 24, 1884. Its title to the remaining 80 bonds is derived by the same agreement, but not from Mason and Jillson.

The agreement of September 24, 1884, known as the "tripartite" agreement, was intended by the parties to be in further performance of the agreement of April 14, 1884. It is idle for either party to assert mistake or misrepresentation as a ground for assailing the rights of the other under either agreement, upon any facts which have thus far been made to appear. Those who entered into these agreements were shrewd business men, speculators on both sides, who did not commit themselves without a full understanding of the situation. By these agreements the complainant was recognized as the beneficial owner of all the bonds and stock of the Toledo & Indianapolis Railway Company not appropriated as a bonus by Mason and Jillson, or as commissions by the finance company, and became entitled to a corresponding amount of the securities of the new corporation which the parties contemplated organizing. Whether under the tripartite agreement the finance company was to be treated as the absolute owner of $80,000 of the bonds in satisfaction of any claim it might be entitled to make growing out of the first contract, or whether it was to hold these bonds until it should negotiate the bonds of the complainant at not less than 90 cents on the dollar under the conditions of that agreement, and then have absolute title, would not be altogether clear, were it not for the letter of the president of the finance company to complainant of the date of September 16, 1884. In view of that letter, it seems reasonably plain that it was the understanding of the parties, as expressed in the tripartite agreement, that the finance company should acquire the absolute title to the bonds in consideration of services already performed. This conclusion disposes of the controversy, so far as it relates to 80 of the bonds.

The finance company has no title to the remaining 22 bonds, if the note made by the complainant pursuant to the scheme of the tripartite agreement is void for usury. Twenty of the bonds were acquired by Mason and Jillson as a pledge to secure payment of the note, and the

other 2 were "appropriated" as a bonus for the loan evidenced by the note. The note purports to be made at New York, is dated September 24, 1884, is signed by the complainant, and reads as follows:

"On or before September 24, 1886, and upon the return of securities pledged, I promise to pay to my own order, at the office of the American Loan & Trust Company, New York, ten thousand dollars, for value received, with interest at the rate of six per cent. per annum from date, payable semi-annually, having deposited with the holder thereof, as collateral security, twenty first-mortgage bonds of the Toledo & Indianapolis Railway Company, for 1,000 each, with coupons for April 1, 1885, with authority to sell the same, or other securities subsequently substituted at the board of brokers, or at public or private sale, at holder's option, on the non-performance of this promise, and without further notice; applying the net proceeds to the payment of this note, including interest, and accounting to me for the surplus, if any. In case of deficiency, the maker promises to pay to the holders thereof the amount thereof forthwith after such sale, with legal interest."

On the twenty-fourth day of September, 1884, the plaintiff signed and delivered to the president of the finance company, at Providence, Rhode Island, a number of notes of the same tenor, for the aggregate amount of $325,000. This note was one of the series. They were made to secure the payment of a loan to that amount which Mason and Jillson had consented to make to the complainant upon the conditions expressed in the tripartite agreement. By that agreement Mason and Jillson promised to loan $325,000 to complainant upon his notes, to be made in form approved by them, with mortgage bonds of the Toledo & Indianapolis Railway Company in double the amount as collateral. For making the loan they were to receive a large bonus in excess of interest at the rate of 6 per cent. per annum. The negotiations leading to the contract were closed at Providence, Rhode Island, that being the domicile of Mason and Jillson, and the contract was formally executed there. After the contract was signed, the notes were delivered there by plaintiff to Mason and Jillson. The bonds to be put up as collateral were not delivered. It was understood between the parties that the complainant did not then have the bonds, but that they were to be acquired subsequently, and that the money to be loaned by Mason and Jillson was to be remitted by them to the finance company in New York city, to be used by that company for the purpose of acquiring the bonds. The bonds at that time were in the hands of various corporations and individuals, who had supplied materials for furnishing and equipping the railway which had been recently constructed by the Toledo & Indianapolis Railway Company. One Dowling had been the contractor for building the railway, and under his contract with the railway company became entitled to all the bonds ($800,000 in amount) and capital stock of the railway company upon payment of the claims of those to whom the bonds had been pledged. The complainant had acquired Dowling's rights, and had applied to the finance company to assist him in raising money to pay up the claims of those to whom the bonds were pledged, and the other claims against the railway company, his intention being to acquire all the capital stock and mortgage bonds of the railway company, and to

organize a new corporation. The complainant and the finance company had entered into an agreement bearing date April 14, 1884, by which the latter, for certain commissions, undertook to raise the necessary means for the complainant to effect this object. As has been stated, the tripartite agreement was understood by all the parties to it to be supplementary to the April agreement between the complainant and the finance company, and was entered into in order to enable the finance company to carry out the terms of the April agreement with the complainant, so far as new conditions were not substituted in the new contract. The parties contemplated that the finance company should occupy the relation of an intermediary or trustee *sub modo* between the complainant and Mason and Jillson, for the protection of the rights of all, and it was understood that Mason and Jillson should remit moneys to the finance company from time to time, when necessary to enable that company to settle with the creditors of the Toledo & Indianapolis Railway Company, and acquire their claims and the bonds, and that the finance company should hold the claims as a trust fund, and cancel them upon the payment of the loan. Apparently, by the scheme contemplated, the finance company was to hold all the bonds acquired until they were exchanged for bonds of the new corporation which was to be created, unless it should be found desirable to negotiate the complainant's notes, or some of them, with the bonds, as collateral to enable Mason and Jillson to make advances, or unless in the mean time the complainant might desire to sell his portion of them, and use the proceeds for the payment of the loan.

It is conceded by counsel for both parties that the loan was made upon a usurious consideration, if the agreement was a New York contract; that is, if its legality is to be tested by the law of New York. The agreement was not usurious if it was a Rhode Island contract. The argument for the plaintiff is that it is a New York contract, because the notes were payable in New York, and because New York is the place of the substantial performance of the controlling provisions of the tripartite agreement. The argument for the defendant is that it is a Rhode Island contract, because the notes and contract were made in Rhode Island, and the notes were negotiated there.

There was no purpose on the part of any of the parties in making the contract in Rhode Island to evade the usury laws of New York. The complainant was a citizen of Ohio, and came to Providence because the defendants lived here. The negotiations were closed and the instrument formally executed there, and the notes were delivered there as a matter of business convenience. It does not seem to be necessary to enter upon a discussion of the subject of the *lex loci contractus*, as determined by the place of the making or the place of the contemplated performance of a contract. The general rules which control, and their exceptions, are familiar, but the books are full of conflicting illustrations of their application to the particular case. The primary rule is that the validity of a contract is to be determined by the law of the state in which it is made. If it is valid there, it is deemed valid everywhere, and will sustain an action in the courts of a state whose laws do not permit such a contract.

*Scudder* v. *Union Nat. Bank*, 91 U. S. 406. If the contract is not in itself immoral, although it is expressly prohibited by the statutes of the state in which the suit is brought, the courts administering the comity of that state will not refuse to enforce such a contract, made by one of its own citizens in a state the laws of which permit the contract. *Greenwood* v. *Curtis*, 6 Mass. 358; *McIntyre* v. *Parks*, 3 Metc. 207; *Akers* v. *Demond*, 103 Mass. 318. The principal exception to the rule that a contract is to be governed as to its interpretation, its nature, and obligation, by the law of the place where it is made, is that the law of the place where it is to be performed will govern the mode of performance, because it is presumed that the parties had this law in contemplation when they entered into the contract. Inasmuch as this exception rests upon the presumed intention of the parties to conform to the rule of the local law in carrying the contract into effect, it seems strange that it should ever have been treated as the criterion by which to ascertain whether the obligation is void for illegality. Phillimore says that, as it rests upon the presumption that the obligor has voluntarily submitted himself to a particular local law, "that presumption may be rebutted, either by an express declaration to the contrary, by the fact that the obligation is illegal by that particular law, though legal by another. The parties cannot be presumed to have contemplated a law which would defeat their engagement." 4 Int. Law, § 654, p. 471.

Generally the place of performance of a contract, when the contract is a promise to pay money, is the place where the payment is to be made; yet this is not always controlling, and, in some cases, the courts which have looked to the place of performance as the place of the contract treat the place of payment as an incidental circumstance, and look behind the written instrument to ascertain what place the parties had in mind as the place of the contract. *Wayne Co. Sav. Bank* v. *Low*, 81 N. Y. 566; *Western Transp. & Coal Co.* v. *Kilderhouse*, 87 N. Y. 430. In both of these cases the state where the parties agreed upon the terms of a loan was held the place of the contract, when the legality of an agreement to pay interest would have been usurious by the law of the state in which the note evidencing the loan was made payable.

Without pursuing the general subject further, it suffices that, when the question is whether a contract is void for usury or not, the weight of authority is now decidedly to the effect that the parties to a loan who contract in one state, and provide for payment in another, may lawfully stipulate for interest according to the law of either state,—that where the contract is made, or that where the money loaned is to be repaid,—as they may in good faith agree. *Depau* v. *Humphreys*, 8 Mart. (N. S.) 1; *Chapman* v. *Robertson*, 6 Paige, 627; *Peck* v. *Mayo*, 14 Vt. 33; *Townsend* v. *Riley*, 46 N. H. 300; *Kilgore* v. *Dempsey*, 25 Ohio St. 413; *Arnold* v. *Potter*, 22 Iowa, 200.

In *Miller* v. *Tiffany*, 1 Wall. 298, 310, Mr. Justice SWAYNE, delivering the opinion, uses this language:

"The general principle in relation to contracts made in one place, to be performed in another, is well settled. They are to be governed by the law of the

place of performance, and, if the interest allowed by the place of performance is higher than that permitted at the place of contract, the parties may stipulate for the higher interest without incurring the penalties of usury. The converse of this proposition is also well settled. If the rate of interest be higher at the place of contract than at the place of performance, the parties may lawfully contract in that case also for the higher rate. These rules are subject to the qualification that the parties act in good faith, and that the form of the transaction is not adopted to disguise its real character."

Adopting these decisions as controlling in the present case, it must be held that the contract here, being valid by the law of Rhode Island, where it was made, is not affected by the fact that the notes evidencing the loan were made payable in New York city. The motion is therefore denied.