---

## THE FRI.

(Circuit Court of Appeals, Second Circuit. April 30, 1907.)

### No. 1,991.

1. SHIPPING—CONTRACT OF AFFREIGHTMENT—BILL OF LADING GIVEN TO CHARTERER.

When the charterer of a vessel is the shipper of the cargo, a bill of lading given by the master operates merely as a receipt for the goods and a document of title, and never, as between the shipowner and charterer, affects the terms of the charter party.

2. Contracts—Legality — Public Policy — Enforcement of Foreign Contract—Provision Exempting Charterer from Liability for Negligence.

A provision in a contract of affreightment exempting a carrier by sea from liability for loss or damage to cargo "occasioned by negligence, default or error of judgment of the pilot, master or mariners," may be enforced in a court of the United States where the contract was made in a country by whose laws such stipulation was legal and no part of it was to be performed in the United States, and where it related to the transportation of property on a foreign vessel on a voyage which did not include a port of the United States.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 11, Contracts, § 498.]

3. Shipping—Charter Party—Charter of Affreightment—Legality of Provisions—Public Policy.

When a charter party gives to the charterer the full capacity of the ship, the owner is not a common carrier, but a bailee to transport as a private carrier for hire, and a condition in such a contract, to which the Harter act (Act Feb. 13, 1893, c. 105, 27 Stat. 445 [U. S. Comp. St. 1901, p. 2947]) has no application, exempting the shipowner from liability on account of the carelessness of its employés, is not contrary to public policy.

Appeal from the District Court of the United States for the Eastern District of New York.

For opinion below, see 140 Fed. 123.

F. B. Brown and Butler, Notman & Mynderse, for appellants.

A. C. Weil and R. Weil, for appellees.

Before WALLACE, LACOMBE, and TOWNSEND, Circuit Judges.

WALLACE, Circuit Judge. The libel in this action was filed to recover the value of 706 head of cattle and 309 calves, belonging to the libelants, and shipped by them on the steamship Fri in September, 1902, at the port of Carthagena, United States of Colombia, for transportation to Cienfuegos, Cuba. The vessel sailed for Cienfuegos on September 24th, and two days later, shortly after midnight, stranded on the Bajo Nuevo reef, and in consequence the cattle had to be thrown overboard and were lost.

The stranding was caused by a fault of navigation on the part of the master of the steamship in failing, when he laid the vessel's course late in the afternoon of September 25th for passing to the eastward of the reef, to make due allowance for the strong set of the ocean current to the westward. He was an experienced navigator, but he had never navigated a vessel in that part of the Caribbean Sea, and relied concerning the force and direction of the prevailing currents upon the information he had sought from other navigators, and upon the instructions given in the charts and official publications with which he had been provided. But he permitted his judgment to be unduly influenced in departing from these instructions by his deductions based upon his own observations throughout the preceding day.

The controlling question presented by this appeal is whether under the contract of affreightment the vessel was relieved of liability to the libelants for a loss arising from this fault of navigation. The case involves to some extent a consideration of the law of the United States of Colombia, the country in which the contract was made.

The material provisions of the statutes of Colombia are those which provide that in the absence of a charter party the terms and conditions of a contract of affreightment are those stated in the bill of lading, and require the charter party to be in writing, or established by documentary or written evidence where the freight exceeds 200 pesos ($2), and those which permit parties to renounce any rights which relate only to the private interest of the renouncer. The testimony of the experts, lawyers of Colombia, justifies the conclusion that the unwritten law of the country permits and gives effect to stipulations in contracts of affreightment whereby the vessel and her owners are exempted from responsibility on account of errors or carelessness of employés in navigating the vessel.

The cattle were shipped pursuant to a charter party agreed to between the libelants and the owners of the steamship, in form such as had been executed between the parties on former occasions when the libelants had chartered steamers for cattle shipments of the vessel owners. It happened, however, that at the time of this agreement none of the blank charter parties were accessible, and the parties agreed that the blank forms such as had been customarily used between them should constitute the contract except as to the terms of freight. This agreement is satisfactorily established by documentary evidence. The shipper's agents by letter inquired whether the shippers accepted the clauses of the customary charter party, and to this letter the libelants replied in effect that their only objection was that they had not promised to pay freight for as many cattle as the Fri should carry, but only for as many cattle as they were able to load. Subsequently the master of the Fri delivered a bill of lading to the libelants, which was accepted by them, reciting $4,250 as the gross freight, a sum equivalent to the full capacity of the vessel. The libel alleges this sum as the agreed freight.

The blank form of charter party which had customarily been signed by the parties provided that the vessel should have the fittings and means of ventilation to comfortably and properly carry the cattle, and that the charterers should load the full capacity of the vessel, and contained a stipulation exempting the vessel and her owners from liability for errors of navigation "occasioned by negligence, default or error of judgment of the pilot, master or mariner." The bill of lading which was delivered to the libelants provided, among other things, that the shipment should be "subject to all the terms and provisions of, and all the exemptions from, liability contained in the act of Congress of the United States approved on the 13th day of February, 1893, c. 105, 27 Stat. 445 [U. S. Comp. St. 1901, p. 2947], meaning the act known as the "Harter Act."

The ground upon which the court below condemned the vessel was that the disaster was caused by the negligence of the master, that the stipulation in the charter party was qualified by the provision in the bill of lading in reference to the Harter act, and that it had not been so satisfactorily proved by the owners of the vessel that they had used due diligence in the selection of the master as to enable them to obtain the benefits of the Harter act. In his opinion the District Judge said, speaking of the master:

"The variety of his long experience at sea indicates sufficient skill to conduct the steamer during a four days' voyage without collision with the reef. He was careless in gathering facts, or in failing to use facts that were plainly laid before him in a printed book. Capacity to perform a duty includes not only technical skill, but also disposition to use the same."

It appeared by the proofs, and was undisputed, that the master for over 15 years had navigated ocean vessels as master in many seas. Before he was appointed to the command of the Fri by her owners he had been in command of another steamship of theirs for over a year, and he had made several voyages in command of the Fri before the voyage upon which the disaster took place. They had had an ample opportunity to estimate his capacity. It would seem to be holding them to an extreme and impracticable rule of diligence to require them to give better proof of his general competency than was actually shown. The testimony in respect to his navigation upon the voyage in question, to which it is not necessary to advert, was sufficient to show his competency generally; and it does show that the disaster happened not through his incompetency or inefficiency, but by putting his own judgment, based upon his general experience and what he thought he had ascertained respecting the force and direction of the currents during the previous two days, against the instructions of the books and charts with which he had been provided. Passing, however, the question whether the evidence was not sufficient to prove that the owner of the vessel had exercised due diligence to select a competent master, and therefore sufficient to exempt the vessel in view of the provisions of the Harter act, it remains to be considered whether the court below was correct in deciding that the stipulation in the bill of lading so far qualified the stipulation in the charter party as practically to displace it.

The bill of lading was a printed form adapted for use when the owners of the Fri chartered any of the vessels of their line for voyages to ports of the United States, and, if the present charter had been for a voyage to one of these ports, the stipulation would in some respects have afforded them a larger protection than they would have obtained under the charter party. It is quite inadmissible to consider it as enlarging a liability which it was designed to restrict. This is so, irrespective of the particular circumstances. As between the original parties to it a bill of lading never affects the terms of the charter party, although it may be resorted to to resolve doubts, if any there are, in particulars as to which the charter party is ambiguous. "The usual practice is for the master, or agent of the shipowner, to give bills of lading for the cargo, although it may be shipped under a charter party. When the charterer himself ships the goods these bills of lading operate as receipts for them, and also as documents of title which he can negotiate, and thereby constructively transfer possession of the goods. But they do not, as between the shipowner and the charterer, operate as new contracts, or as modifying the contract in the charter party. Where the bill of lading has been transferred for value to third persons who are strangers to the charter party, its terms become very important. It then constitutes an undertaking on the part of the shipowner with the holders, which is independent of the charter

party, except so far as that is expressly incorporated in it." Carver, Carriage by Sea, 151, 152. It constitutes the contract between the parties where there is no charter party, but where there is a charter party it never supersedes any unequivocal provisions therein. This has long been settled by the adjudications. The rule is that where there is a charter party the bill of lading operates as the receipt for the goods, and as a document of title passing the property of the goods, but not as varying the contract between the charterer and the ship-owner. Wagstaf v. Anderson, 5 C. P. Div. 171, 177; Rodocanachi Sons & Co. v. Milburn Bros., 6 Asp. 100, 103; Sewell v. Burdick, 10 App. Cas. 74, 105; The Chadwick (D. C.) 29 Fed. 521.

Finding, as we must, that the contract of affreightment between the parties contained an explicit condition exempting the vessel from liability for a loss arising under the circumstances disclosed by the evidence, and that the scope of this condition was not in the slightest degree narrowed by the stipulation in the bill of lading, and finding also, as we must, that by the law of the country where the contract was made such a condition is effectual to restrict the liability of the carrier, it only remains to consider whether the contract will be upheld by the courts of the United States.

By the decisions of the federal courts such stipulations in a contract made in this country, or made abroad and to be performed here, when the parties to them are a common carrier and a shipper of goods, are deemed contrary to public policy; and by the Harter act, when they are made by the owner of any vessel transporting merchandise or property "from or between ports of the United States and foreign ports," are declared to be unlawful. The rule is familiar that the law of a place where a contract is made governs its nature, obligation, and interpretation, unless it appears that the parties when entering into the contract intended to be bound by the law of some other state. It is also a familiar general rule that a contract valid in the state where it is made will be enforced upon principles of comity in the courts of a state by whose law it is invalid, and this even though the contract contravenes a statute of the state in which the suit is brought. This is illustrated by the cases in which such contracts have been enforced though violating the Sunday laws, or the usury laws, of the forum. Of course, this comity does not extend to contracts that are immoral, or repugnant to the fundamental law or the public policy of the state where they are sought to be enforced. Brown v. Am. Finance Co. (C. C.) 31 Fed. 516; Swann v. Swann (C. C.) 21 Fed. 299; Brown v. Browning, 15 R. I. 422, 7 Atl. 403, 2 Am. St. Rep. 908; Greenwood v. Curtis, 6 Mass. 358, 4 Am. Dec. 145; Akers v. Demond, 103 Mass. 318; Kennett v. Chambers, 14 How. 38, 14 L. Ed. 316; Oscanyan v. Winchester Arms Co., 103 U. S. 261, 277, 26 L. Ed. 539.

None of the adjudications in the federal courts decide that the stipulation is void as contrary to public policy, and that it will not be enforced for that reason, in cases where the contract of affreightment was made in a state by whose laws the stipulation is valid, when no part of it is to be performed in this country, and when, as in the case here, it does not relate to a contract or vessel within the terms of the Harter act. In Botany Worsted Mills v. Knott, 82 Fed. 471, 27 C.

C. A. 326, this court refused to enforce such a stipulation in a case where there was no evidence to indicate that the law of the place of the contract differed from the law of this country. In The Kensington, 94 Fed. 885, 36 C. C. A. 533, this court held that the contract could not be enforced "where both parties to the contract are citizens of the United States and the place of the completion of the contract is within this country." That case was affirmed by the Supreme Court in 183 U. S. 263, 22 Sup. Ct. 102, 46 L. Ed. 190. Liverpool & Great Western S. S. Co. v. Phenix Ins. Co., 129 U. S. 397, 9 Sup. Ct. 469, 32 L. Ed. 788, was a case where the contract of affreightment was made in an American port by an American shipper, with an English steamship company doing business there, for the shipment of goods there, and their carriage to and delivery in England, and the decision proceeded upon the ground that the contract was an American contract, and governed by American law so far as regarded the effect of the stipulation.

We are unable to appreciate how a contract made in a country where it is valid, no part of which is to be performed in this country, and relating to the transportation of property on a foreign vessel on a voyage which does not include an American port, can be one which particularly concerns the public policy of the United States. When the parties to such a contract choose to resort to the courts of this country to enforce it, there seems to be no sound reason, as there certainly is no direct authority, for deciding that the contract shall not be enforced in substance and effect as they agreed.

In this case, however, a common carrier was not a party to the contract. When a charter party gives to the charterer the full capacity of the ship, the owner is not a common carrier, but a bailee to transport as a private carrier for hire. Hutchinson, Carriers (2d Ed.) 73. See, also, Sumner v. Caswell (D. C.) 20 Fed. 249, and the authorities there referred to. It has not yet been decided by any court that a condition in such a contract, to which the Harter act has no application, relieving a shipowner from liability on account of the carelessness of its employés, is contrary to public policy.

The decisions which deny the validity of such stipulations proceed upon the ground that the carrier is exercising a public employment, and cannot by such stipulations relax his obligations to the public. Private carriers are not subject to the exceptional or extraordinary duties and liabilities of common carriers, and they may carry for whom they choose, and for such compensation and upon such conditions of liability as may be agreed upon. The contracting parties stand upon equal terms, and can make such a contract as they think reasonable. Angell, Law of Carriers, 59.

We conclude that the stipulation in the charter party was valid, and the defense founded upon it should have been sustained by the court below.

The decree is accordingly reversed, with costs, and with instructions to dismiss the libel.