### THE LEWIS H. GOWARD.

### AMERICAN NAV. CO. v. C. G. BLAKE CO., Inc.

District Court, S. D. New York. August 4, 1924.

792

Bigham, Englar & Jones, D. R. Englar, and H. B. Potter, all of New York City, for libelant.

Burlingham, Veeder, Masten & Fearey and J. L. Galey, all of New York City, for respondent.

WARD, Circuit Judge. September 25, 1919, C. G. Blake Company, Inc., as agents for Bensaude & Co., of Lisbon, chartered the schooner Lewis H. Goward to carry a cargo of coal to the Azores. This charter party contained an express warranty of seaworthiness, and the freight was paid in advance, not recoverable vessel and/or cargo lost or not lost.

October 31, 1919, the schooner sailed from Newport News with a cargo of 1,726 tons. She encountered heavy weather and took in water through her decks, rudder trunk, and sides, which the pumps were not able to control, and was obliged to put into St. Georges, Bermuda, as a port of refuge. There a survey was held, the surveyors recommending that her cargo be discharged and certain repairs made, which having been done, they pronounced the schooner fit to carry the cargo to destination. When about half had been reloaded, it was discovered that the coal was heating, and the surveyors recommended that so much as had been reloaded be discharged, and the whole cargo sold at Bermuda, which was done, and the proceeds were paid to the insurers of the cargo.

April 7, 1919, C. G. Blake Company, Inc., filed this libel in rem against the schooner to recover damages for failure to carry the coal to destination. July 7 the American Navigation Company, claimant, filed a cross-libel to recover contribution in general average from the cargo. By amendment of the libel, it was stated that Bensaude & Co. were the owners of the cargo and that C. G. Blake Company, Inc., brought suit as their agents, and it was stipulated at the trial that the

insurers of the cargo were the real parties in interest.

■ The shipowners were never asked to carry to destination, and never refused to do so. The charterers, cargo owner, and the insurers of cargo all approved of the sale at Bermuda as recommended by the surveyors; no reservation of any claim against the schooner or owners was made at the time. The libel subsequently filed made no claim for damage to the cargo, but only for breach of contract to carry it to the Azores. When the testimony of the surveyors was taken, June 2, 1920, under a commission to Bermuda, the counsel for libelant constantly objected to any testimony as to damage to the cargo, on the ground that it was irrelevant, immaterial, and not within the issues.

On the foregoing state of facts it seems to me quite clear that the cargo was accepted at Bermuda in full discharge of all liability of the schooner or of her owners (The Propeller Mohawk, 8 Wall. 153, 19 L. Ed. 406), and therefore the libel must be dismissed.

There is the further consideration that, if the heating of the coal, which caused the abandonment of the voyage, falls within the exception of "fire" in the charter party, there is no proof that it was due to any default of the shipowner.

■ Coming now to the cross-libel, which claims to recover contribution from the cargo in general average. The case of The G. R. Crowe (C. C. A.) 294 F. 506, much relied upon by the claimant, involved a claim of particular average for damage to cargo, and it was held that the exception of "leakage" qualified the warranty of seaworthiness. But general average is entirely independent of the contract of carriage, and arises as pure equity out of a sacrifice made or an expenditure incurred for the common benefit. Exceptions in a charter party or bill of lading do not apply to it, unless they are expressly stated to do. so. This was the view taken by the English courts in Schmidt v. Royal Mail Steamship Company, reported in the note to Crooks and Allen, 4 Asp. M. C. 216; Burton v. English, 5 Asp. M. C. 187. But in later cases the English courts held that, if the charter party or bill of lading relieves a party from liability for negligence, his negligence cannot be considered a fault in general average proceedings. Strang Steel & Co. v. Scott, 6 Asp. M. C. 419; The Carron Park, 6 Asp. M. C. 543; Milburn v. Jamaica Fruit Co., 9 Asp. M. C. 122. See, also, Carver on Carriage of Goods by Sea (6th Ed.) §§ 80, 373–b.

■ I think that the law of this country is like that of the earlier English cases. A shipowner, whose negligence has contributed to a distress which caused the sacrifice or expenditure for the common benefit, can recover no contribution in general average from the cargo (The Irrawaddy, 171 U. S. 187, 18 S. Ct. 831, 43 L. Ed. 130), unless the right to recover is expressly reserved in the charter party or bill of lading (The Jason, 225 U. S. 32, 32 S. Ct. 560, 56 L. Ed. 969). The shipowner in this case was a mere bailee for transportation for hire (The Fri [C. C. A.] 154 F. 333), and could, of course, make this reservation.

■ But the exception in the charter party relied upon, in my opinion, applies only to the contract of carriage, and not at all to general average. It reads: "Act of God, * * * fire, floods, storms, * * * or any occurrence beyond the control of either party, and all dangers, delays and accidents of the seas, rivers, railroads and navigation of whatsoever nature and kind always mutually excepted."

■ The exception in the bill of lading relied upon, if it can be held to apply to general average, is not available, because I find the peril which caused the expenditure was due to unseaworthiness discoverable by due diligence before the voyage began. "Also fire, * * * accidents of navigation, or latent defects in or accidents to hull and/or machinery and/or boilers always excepted, even when occasioned by the negligence, default or error in judgment of the pilot, masters, mariners or other persons employed by the shipowner or for whose acts he is responsible, not resulting, however, in any case from want of due diligence by the owner of ship or by the ship's husband or manager."

■ If the distress of the schooner was not due to extraordinary weather, but to her inability to withstand weather ordinarily to be expected, her owner must bear the consequent loss (Benner Line v. Pendleton [C. C. A.] 217 F. 497), and the burden lies upon him to show that she was seaworthy when the voyage began (The Edwin I. Morrison, 153 U. S. 199, 14 S. Ct. 823, 38 L. Ed. 688), or that he was protected by the Harter Act (46 USCA §§ 190–195), or by an exception reserving the right to contribution, and that he had exercised due care to make her seaworthy, or that her unseaworthiness was not discoverable by due diligence (The Jason, 225 U. S. 32, 32 S. Ct. 560, 56 L. Ed. 969).

The surveyors at Bermuda attributed the opening of the seam to heavy weather, but their finding is not entitled to much weight.

Obviously the leaks might have resulted in whole or in part from unseaworthiness in weather to be expected in the North Atlantic in November, and they knew nothing about the condition of the schooner when she sailed. They concluded, from the log, the damage to sails and equipment, and from the master's statement, that the sole cause of the leaks was heavy weather. If they had found the caulking of the deck and seams insufficient, and the rudder trunk defective, when the voyage began, their conclusion would doubtless have been different.

After careful consideration, I cannot reconcile the entries in the log as to the wind and sea—the master's description of the weather, in the note of protest dated November 18, 1919, the day he arrived at St. Georges, as "boisterous," and the testimony of himself and of the mate, Sullivan, filed January 6, 1921, as to the rate at which the wind was blowing—with an unusual condition of wind and sea.

It is true that sails were split or blown away as the result of tackle breaking, but this is not unusual. It happens in ordinary rough weather, if the sails are old, or their fasts insufficient, or if they should have been reefed or furled sooner. The strain being attributed to the schooner's rolling and not to pitching, the only strain upon the fore topmast jumper stay would be when her bow rose and her stern fell. The foreboom is described as broken, but how or why it broke is not explained, probably by the parting of its fasts. It was repaired and replaced November 13 with new tackle. The most dangerous leak was from the rudder trunk, which admitted water into the 'tween-decks, and no previous examination was proved as to it.

Assuming that the schooner was in a seaworthy condition in April and May, 1919, there is no sufficient proof that she was so when she sailed October 31st. The examination at that time of her seams on deck and on her top sides, which opened on the voyage, was very casual and largely visual, and there was no examination of her rudder trunk at all.

A decree may be entered, dismissing the libel and the cross-libel, with costs.