## THE OAKLEY C. CURTIS.*

(Circuit Court of Appeals. Second Circuit. December 2, 1924.)

No. 53.

**1. Shipping ⬤⇒58(2)—Evidence held to prove damage to linseed due to bad dunnage and unseaworthy condition of ship.**

Evidence *held* to prove damage to linseed was due to bad dunnage and failure to close air strakes, making ship unseaworthy, and not to severity of storm.

**2. Shipping ⬤⇒53—Damage to linseed due to faulty dunnage held chargeable to ship, though cargo was stowed by charterer's agent.**

Damage to linseed due to bad dunnage was chargeable to ship, though linseed was stowed by charterer's agent, where such agent stowed it at directions of master and mate, and ship was dunnaged by stevedore, appointed by master, and faulty dunnage was not apparent, since charterer's agent could assume that ship has been properly fitted to receive cargo.

**3. Shipping ⬤⇒42—Damage to linseed due to leaks about pump house and hole in galley floor held chargeable to ship.**

Damage to linseed caused by leaks about pump house on the 'tween decks, and hole in galley floor, *held* chargeable to ship; such leaks and hole constituting an unseaworthy condition.

**4. Shipping ⬤⇒42—Seaworthiness depends upon kind of cargo carried.**

Seaworthiness depends upon kind of cargo carried.

*Certiorari denied 45 S. Ct. 354, 69 L. Ed. ——.

**5. Carriers ☞4—Ship not "common carrier" where whole is chartered.**

A ship is not a common carrier, where the whole of the ship is chartered.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Common Carrier.]

**6. Shipping ☞42—Damage to linseed caused by hole in waste pipe held not chargeable to ship.**

Damage to linseed due to hole in waste pipe *held* not chargeable to ship, in the absence of a showing that ship was unseaworthy at outset of voyage, where rats had probably gnawed hole in waste pipe.

**7. Shipping ☞58(2)—Libelant had burden of proving that unseaworthy condition existed at outset of voyage.**

In libel for damage to linseed due to hole in waste pipe, libelant had burden of proving that the ship was unseaworthy at outset of voyage.

**8. Shipping ☞53—Separation of damaged linseed from undamaged portion of cargo prima facie correct.**

Separation of damaged linseed from that part of cargo which was undamaged during voyage *held* prima facie correct.

Appeal from the District Court of the United States for the Southern District of New York.

Libel by the Midland Linseed Products Company against the schooner Oakley C. Curtis, her tackle, etc., and the France & Canada Steamship Corporation, owner. From the decree rendered (285 F. 612), both parties appeal. Modified.

Everett, Clarke & Benedict, of New York City (Herman S. Hertwig and William F. Allen, both of New York City, of counsel), for appellant.

Patterson, Eagle, Greenough & Day, of New York City (Carroll G. Walter and Charles D. Francis, both of New York City, of counsel), for appellee.

Before ROGERS and MANTON, Circuit Judges, and LEARNED HAND, District Judge.

LEARNED HAND, District Judge. The cause came up upon a libel in rem against the schooner Oakley C. Curtis and in personam against its owner, the France & Canada Steamship Corporation, for damage to a cargo of linseed shipped from Buenos Ayres to New York and damaged on the way. The whole ship was chartered for the voyage, and the charter party contained nothing material except the following: That the captain's report of readiness should be "accompanied by underwriter's surveyor's certifi-

cate to that effect, cost of same to be for charterer's account." Also, "Charterers to provide stevedore to be approved by captain at owner's expense at customary rates only." Finally, if the owners should use due diligence to make the vessel seaworthy, they should be liable for no damage arising from unseaworthiness.

Most of the cargo was loaded at Buenos Ayres in bags, in the hold and 'tween decks; but after these had been nearly filled, certain of the bags were slit and the loose linseed poured upon them, apparently to give stiffness and cohesion to the whole mass. One Santos, appointed by the master, provided the dunnage for the vessel, laying a false floor at the bottom of the hold, 14 or 15 inches above the tank tops, which he covered with burlap. He lined the sides with vertical scantlings, which were also covered with burlap, to keep the bags from the inner skin of the ship; but in places he failed to put in the necessary cross-pieces. Between the two skins was a space of some 4 or 5 inches, and at the top of the inner skin underneath the 'tween decks was an open strake called an "air strake," which vessel's timbers made into a series of small compartments leading between the two skins of the ship into the bilges.

On the outturn at New York it was found that much of the linseed had been wet with sea water. The dunnage floor had broken down in several places, some of the air strakes were filled with loose and wet linseed, and some six or seven tiers of bags in the lower hold were wet through. Some of the bags along the sides of the hold were wet. In the 'tween decks near the pumphouse partition the bottom bags were wet, and below the house in the hold the bags were wet down to the bottom. A third damage was in the 'tween decks beneath the galley, in the floor of which a hole had been made which was plugged with wood. The bags beneath this hole were wet from top to bottom. Finally, some damage was done by a leak in the waste pipe of the sink in the captain's stateroom.

The libelant contended that the chief damage occurred because the dunnage was improper and the air strakes had not been closed. The lesser damage arose from the leaks from the pump house, from the galley floor, and from the captain's stateroom. In these respects the vessel was unseaworthy. The respondent-claimant contended that the water had come in because of the severe weather which the ship encountered on her voyage north, by which her seams were opened. This

it argued was a peril of the sea for which the ship was not liable. The District Judge held that the dunnage had been insufficient, that the air strakes had been left open, and that the schooner was liable for all the wet linseed in the hold, both the seven tiers at the bottom and the bags along the sides next to the inner skin of the ship. He declined to hold her for the damage done about the pump house either on the 'tween decks or in the hold, or for the damage caused from the hole in the galley floor or in the waste pipe. Upon the reference a sharp issue of fact was raised as to the actual damage done by those faults for which he allowed recovery.

[1] We agree with the learned trial judge, that the damage in the bottom and on the sides arose from bad dunnage and not from stress of weather, though we cannot be sure whether it was from the breaking of the dunnage floor or the shifting of loose linseed through the air strakes or both. The primary cause was the choking of the pumps, which began shortly after the gale arose. We are not impressed with the severity of this storm; on the contrary, we think it quite clear that it was no heavier than any able ship well found should have weathered without mishap. The trouble was that after the pumps choked, the normal leakage of the vessel could not be controlled and the water thus made in her hold made her more susceptible to the wrenches of the seas, and no doubt opened her seams. The pumps choked because of lint and linseed, the first of which came from the burlaps and the second from the cargo. We do not see how if all had held the mere wash of water below the dunnage floor could have torn open the bags or washed off the lint. But we find that the floor was improperly built and gave way. This might well have broken the bags and filled the bilges with seed and with lint. The mere breaking of the floor is some evidence of its improper construction.

Further we find that the air strakes were not closed, which made the ship pro hac vice unseaworthy, and that the seed sifted through the burlap and into the space between the skins of the ship. The argument does not impress us that the burlap would have prevented this. There was a quantity of loose seed thrown in at the end, and to say that this could not have worked through the meshes of the burlap is unwarranted. Indeed, the bags stowed against the air strakes might have broken with the pressure of the cargo and the working of the ship. Nor would the salt boxes check the fall of the seed because they were presumably not

there. Against these hypothetical objections we choose the direct evidence of those who saw the strakes after the discharge. We therefore agree with the facts as found by the trial judge.

The libelant's responsibility for the damage so resulting in the face of the language already quoted from the charter party would be an embarrassing question if it had in fact "provided the stevedore" who dunnaged the ship, but it did not. The evidence is clear that the master appointed Santos, and that Santos took his directions from him. These directions were that he should in turn follow the directions of Lloyd's surveyor; certainly not the agent of the libelant, though he was paid by it. Hence the question does not arise which was up in such cases as Blaikie v. Stembridge, 6 C. B. N. S. 894, affirmed in Ex. Ch., on page 911; The Catharine Collins, 2 App. M. C. N. S. 598; Harris v. Best, 7 Asp. M. C. N. S. 272 (C. A.); Sack v. Ford, 13 C. B. N. S. 90; Steinman v. Angier, L. R. (1891) Q. B. 619 (C. A.); The Seguranca, 250 F. 19, 22, 162 C. C. A. 191 (C. C. A. 5); and The Diadem, 4 Ben. 247, Fed. Cas. No. 3,875. Those cases all assume that when the charterer appoints the stevedore he does the storage at his own discretion and that the master supervises it only so far as is necessary for the trim and safety of the ship. In the case at bar the contrary was the fact as respects dunnage.

[2] It is true, however, that Ford & Co. were the libelant's agents, in this as in other cases, and that they stowed the seed though they did not place the dunnage. The respondent-claimant argues that the libelant thus became privy to the faulty dunnage. But the faults in the dunnage could not appear because the whole was covered with burlap including the strakes. At most, it could be said only that the absence of proper crosspieces at the sides must have been noticeable when the bags touched the skin of the ship. We do not think that the libelant was responsible for so nice a scrutiny, but that its agents were free to assume that the holds had been properly fitted to receive the cargo. Finally, it is to be noticed that the stevedores, Ford & Co., say that they stowed the ship at the directions of the master and the mate. Hence we hold the ship for the damage to the bottom tiers and to the bags along the sides of the hold.

[3, 4] We differ from the learned District Judge as respects the leaks about the pump house on the 'tween decks, and the floor of the galley. As to the first, the water could

not have wet the bags on the bottom of the 'tween decks close to the joint of the pump house partition with the 'tween deck unless the joint had leaked. In carrying .coal, which the ship had theretofore done, such leaks were of no moment, for seaworthiness depends upon the kind of cargo carried; but if seed was to be stowed close to the partitions it was essential that the joints should be tight. Every one must know that the pump house floor was likely to be frequently awash, and to carry seed it should have been tight both .at the sides and in the hold beneath. We do not see how this damage could have arisen as suggested ·from the leaks .in the weather deck; if so, the upper tiers would also have been wet, down to the bottom tiers.

Again, .on the balance of probability we do not see how the bags beneath the galley floor could have been wet if the plug was tight. There is direct evidence that it was not. Bagger says that he could put his probe between the side of the plug and the hole, and we think it most probable that the damage occurring at that point must have happened. in the way suggested by the libelant.

[5-7] On the other hand, we do not charge the damage from the waste pipe to the ship. This court has several times held that when the whole of a ship is chartered she is not a common carrier. The Fri, 154 F. 333, 83 C. C. A. 205; The C. R. Sheffer, 249 F. 600, 161 C. C. A. 526. And we are not disposed to re-examine that question now. Concededly it rested, therefore, upon the libelant to prove that in this respect the ship was unseaworthy at the outset of the voyage. The most likely explanation appears to be that rats had gnawed a hole in the waste pipe, but when this happened no one can say.

We come, therefore, to the question of damages, .which is obscure under the proof. The finding of the District Court after the reference is of no service here because of our difference with the trial judge in respect to the damage beneath the galley and about and beneath the pump house. We make the best approximation of the facts that we can. The total. original wet output was tallied by the inspector at 15,696 bags, 692 tubs. We must deduct the damage under the captain's stateroom, which the only evidence in the record places at 1,078 bags, 90 tubs. This leaves for the other damage 14,618 bags, 602 tubs. Now a tub contains 7 bags, but it is clear that if these tubs were full, the bags had leaked, because .otherwise the outturn counting sound and unsound seed together would have been 50,743 bags instead of 47,414, as tallied. The 692 damaged tubs account for a shortage of only 1,315 bags. It will be proper to count the bags as full and distribute these 1,315 bags among 692 tubs, thus crediting 1.9 bags to a tub. So calculated, the damaged bags outside of the item which we reject were 15,916, for which we charge the ship.

[8] .The respondent-claimant argues that from the dock-book of Moser, one of the inspectors, it appears that 145,944 pounds of seed were delivered to and accepted by the libelant from the canal boats into which the damaged seed was delivered and that this must be assumed to have been sound seed. We have examined those books and do not find any evidence of the fact from the pages referred to. On the other hand, the only evidence in the case is that the damaged seed was put in four barges and afterwards sold. It is true that Moser speaks of some of the seed as dry, but this was not necessarily the equivalent of sound seed, as it may have been wet and afterwards dried out. Moser could not say that among the 552,530 pounds weighed on the hopper there was not some unsound seed. The implication would be that he thought most of it sound, but this was merely his opinion, formed we cannot tell how. We can only take the division between sound 'and unsound seed as it was made on the wharf, and was carried out by dumping the damaged part into the four barges. Prima facie this was correct, and there seems to us no evidence sufficient to meet it. The proper proportion of the salvage must be credited to the respondent-claimant.

The decree should therefore be modified by holding the ship for 15,916 bags less the proper proportion of the salvage. In view of the fact that it was impossible until trial to tell exactly with what loss the ·ship was chargeable, we think the court below was correct in the disposition of the item of interest. Faber v. The City of New York, 222 N. Y. 255, 262, 118 N. E. 609. The libelant will take the costs of this appeal.