CHARLES PFIZER & CO., Inc., et al. v. 912 BAGS OF TARTAR AND 58 BAGS OF UVA URSI LEAVES et al.

COMPANIA TRASATLANTICA v. CHARLES PFIZER & CO., Inc., et al.

Nos. 16270, 16279.

District Court, E. D. New York.
July 18, 1941.

Bigham, Englar, Jones & Houston, of New York City (Henry N. Longley and Ezra G. Benedict Fox, both of New York City, of counsel), for libellants.

Hunt, Hill & Betts, of New York City (John W. Crandall, of New York City, of counsel), for cross-libellant.

GALSTON, District Judge.

On January 24 and January 30, 1941, there were delivered to the cross-libellant at Alicante, Spain, two shipments of tartar, one consisting of 1,070 and the other of 340 bags, to be transported by the cross-libellant to New York and delivered to the respondent, Charles Pfizer & Co., Inc.; on January 30, 1941, there were also delivered to the cross-libellant at Alicante, Spain, 524 bags of uva ursi leaves for transportation to New York, and delivery to order of R. J. Prentiss & Co., Inc.

These cargoes were stowed on the motorship Monte Ayala for transportation to Vigo, Spain, and for transshipment at that port to another vessel of the cross-libellant's line. On February 15th, so it is alleged in the cross-libel, the motorship Monte Ayala stranded at Vigo and such of the cargo as was not lost went forward on the steamer Magallanes. That vessel arrived in New York May 25, 1941, and discharged 912 of the original shipment of 1,410 bags of tartar, and 58 of the original shipment of 524 bags of uva ursi. The cross-libellant demanded of the respondents payment of freight on the entire shipments, together with various sorting and other miscellaneous charges, and required the respondents to execute general average agreements pursuant to the provisions in the bills of lading, as a condition of delivery of the cargoes to the respondents. The respondents refused to comply with these requirements and on May 31, 1941, filed a possessory libel against the cargo. The main libel alleged a willingness of the libellants to pay a proper general average charge and to file a surety bond as security for the payment of such charges together with freight and miscellaneous sorting charges. The cross-libellant filed a claim to the cargo. However, the parties agreed that possession of the cargo would be delivered by the cross-libellant in exchange for guarantees of the payment of freight, sorting charges, charges of a special nature, and contributions in general average. The Federal Insurance Company thereupon guaranteed that the respondents (the libellants in the possessory libel) would execute general average agreements in the form required by the cross-libellant if it be determined in this cause that the cross-libellant is entitled to execution of such an agreement as a condition precedent to the delivery of the cargo.

The stipulation therefore forming part of the moving papers recites that the sole question presented for determination by the court on this motion is "whether or not the cross-libellant was entitled to require as a condition precedent to the delivery of the merchandise involved in this action, that the consignees or owners of the said arrived cargo execute general average bonds in the form attached hereto as Exhibit 'C'".

The proposed bond in substance recites that such consignees or owners bind themselves punctually to pay in due course "without the intervention of courts of justice, or private arbitrators, that allotment of contribution which will cover the above-mentioned merchandise, which quota will be derived from the general average liquidation which will take place at the port of Bilboa;" and it is given "in accordance with regulations under Article 868 of the Commercial Code, and Clause 14 of the bills of lading, which are the transportation contract."

Clause 14 of the bills of lading reads as follows: "14. The consignees are liable proportionately to the value of their cargo for such expenses as may be incurred in salvaging the vessel, either by virtue of a

domestic or foreign judicial decree or as a consequence of a settlement with the salvors. Pursuant to the right granted by Article 846 of the Spanish Code of Commerce, it is hereby specifically agreed that in cases of general average, liquidation will be made in Barcelona extrajudicially by experts appointed by the shipowner, and it will be made up according to the provisions of the York-Antwerp rules of 1924, numbers one to fifteen (1 to 15) inclusive, and numbers seventeen to twenty-two (17 to 22) inclusive. All parties concerned renounce the provisions of Articles 847, 851 and 865 of the Code of Commerce, and hereby give their approval to the adjustment which in any such cases may be made up by the adjusters in accordance with the above mentioned rules. In order to secure the payment of the shares of the cargo owners toward the general average contribution, the consignees, and, should they fail to do so, the shippers, agree to deposit with the ship's agent an amount equal to their shares toward the general average contribution as estimated by taking a reasonable percentage of the actual value of the goods, and without this pre-payment no delivery will be made of the shipped goods. The amount so deposited will be credited toward their several portions of the general average expenses when finally ascertained, they to pay any difference should their said finally ascertained portions of the general average expenses be greater and to be reimbursed with the difference if the said portions should be less."

No point is made of the recital in the proposed bond of the designation of Bilboa, instead of Barcelona, as the proposed place in which liquidation is to be determined. The stipulation does not set forth the provisions of the York-Antwerp Rules of 1924, Nos. 1–15 and Nos. 17–22 inclusive; nor does it appear from the stipulation or otherwise what the provisions of Article 868 of the Spanish Commercial Code are.

Article 846 of the Spanish Code of Commerce, referred to in the foregoing paragraph, describes certain rules to be followed in the proof and liquidation of averages in the absence of agreement between the parties.

It is the contention of the libellants that the provisions of the Spanish Code of Commerce are irrelevant to the question presented; first because the provisions of Articles 847, 851 and 865 were renounced in a bill of lading, and further because such code provisions are inapplicable under American law, which law, it is argued, governs the rights of the parties by reason of the fact that the contract voyage terminated in New York. It is urged that the question of liability for general average is controlled by the law of the final port of destination. Charter Shipping Co., · Ltd., v. Bowring, Jones & Tidy, Ltd., (The Charterhague), 281 U.S. 515, 50 S.Ct. 400, 74 L.Ed. 1008; Barnard v. Adams, 10 How. 270, 13 L.Ed. 417; Hobson v. Lord, 92 U.S. 397, 23 L.Ed. 613; Compagnie Francaise de Navigation a Vapeur v. Bonnasse, D.C., 15 F.2d 202; Det Forenede Dampskibs Selskab v. Insurance Co., D.C., 28 F.2d 449; The Lewis H. Goward, D.C., 34 F.2d 791; The Roanoke, 7 Cir., 59 F. 161.

It is true that these cases hold that liability for general average arises not from general contract but from participation in the common venture, and also that such liability is to be determined by the law of the port of destination; nevertheless it is significant that in none of these cases is there found any such limitant phrase as is set forth in the bills of lading in suit. Indeed, in Charter Shipping Co., Ltd., v. Bowring, Jones & Tidy, Ltd., supra, after statement of the proposition set forth, there follows the significant phrase that such is the law *in the absence of limiting clauses in the bills of lading.* (Italics mine.)

The cross-libellant concedes that cases such as The Lewis H. Goward, D.C., 34 F. 2d 791, 793, establish the principle that general average is something independent of the contract of carriage and arises as an equity out of a sacrifice made or expenditure incurred for the common benefit, but points out that Clause 14 of the bills of lading merely provides a procedure to be followed when a case of general average arises—how it is to be liquidated and the rights of the parties adjusted—and quote the following from that case: "Exceptions in a charter party or bill of lading do not apply to it [general average], unless they are expressly stated to do so."

The cross-libellant insists that it is requiring no more than the agreement between the parties contemplated. Rebora v. British & Foreign M. Ins. Co., 258 N.Y. 379, 180 N.E. 90; Corrado Societa Anonima Di Navigazione v. L. Mundet Sons, Inc. (The Albisola), D.C., 18 F.Supp. 37.

The respondent also contends that since the facts laying the basis for the claim for general average do not as yet appear, an

undertaking such as the cross-libellant demands would operate to relieve the carrier of the effects of its own negligence, and of its obligations as to seaworthiness, and in that event would be contrary to the public policy of this country; Liverpool & Great Western Steam Company v. Phenix Ins. Co., 129 U.S. 397, 9 S.Ct. 469, 32 L.Ed. 788; The Irrawady, 171 U.S. 187, 18 S.Ct. 831, 43 L.Ed. 130; The Jason, 225 U.S. 32, 32 S.Ct. 560, 56 L.Ed. 969; and would be at variance with subdivision 8 of Sec. 3 of the U. S. Carriage of Goods by Sea Act, 46 U.S.C.A. § 1303(8); also Sec. 1300. Libellant cites also Frederick H. Leggett & Co. v. 500 Cases of Tomatoes, 2 Cir., 15 F.2d 270.

■ The difficulty with that argument is that Clause 14 of the bills of lading is in effect nothing more than an arbitration agreement as to general average. A provision in a shipping document under which the parties bind themselves to arbitrate in controversies arising thereunder in a foreign country is not unlawful. Shanferoke Coal & Supply Corporation v. Westchester Service Corporation, 293 U.S. 449, 55 S.Ct. 313, 79 L.Ed. 583; Danielsen v. Entre Rios Rys. Co., Ltd., et al., D.C., 22 F.2d 326.

■ Here we have the situation in which the parties undertook, as part of their shipping agreement, to provide the method to be adopted and the forum which was to decide the consequences following the happening of such a contingency. That contingency the cross-libel alleges arose. So the parties must be left to their contract. Certainly the consignee has no stronger position than his consignor. Therefore the liquidation should take place in Spain by adjusters, strictly pursuant to the terms of the bills of lading.

■ There remains for consideration then a critical examination of the terms of the bond which the cross-libellant seeks. The respondent argues that there is nothing in the Spanish Code nor in Clause 14 of the bills of lading which requires the cargo owners to sign general average bonds. That is an unsound contention be-cause the clause in question states: "In order to secure the payment of the shares of the cargo owners toward the general average contribution, the consignees, and should they fail to do so the shippers agree to deposit with the ship's agent an amount equal to their shares toward the general average contribution as estimated by taking a reasonable percentage of the actual value of the goods, and without this pre-payment no delivery will be made of the shipped goods."

Thus the cross-libellant was entitled to pre-payment but waived the pre-payment on the guarantees furnished, leaving open the form of the bond which is to be substituted for such pre-payment. The form of the bond, however, must be strictly in accordance with the provisions of the bills of lading and the rights arising thereunder. It would seem, as the respondent contends, that there are some provisions therein which do not appear explicitly in Clause 14 of the bills of lading, nor even inferentially. For example: The obligor is required to admit that the Monte Ayala "suffered (damage?) during its trip from ——— to ——— due to stranding". No such requirement can be spelled out of Clause 14.

So too the bond requires the obligor "to punctually pay in due course without the intervention of courts of justice * * * that allotment of contribution which will cover the above mentioned merchandise, which quota will be derived from the general average liquidation," but omits reference to the provisions of the York-Antwerp Rules of 1924, according to which Rules the general average is to be calculated, as set forth in the bills of lading.

Since the question for decision as presented in the stipulation is the right of the cross-libellant to require as a condition precedent to the delivery of the merchandise the specific form of bond attached, it must be concluded from the foregoing that the cross-libellant is not entitled to such specific form of bond.

An order in accordance with the foregoing opinion may be entered. Settle order on notice.